## STETSON v. INSURANCE CO. OF NORTH AMERICA.

(District Court, E. D. Pennsylvania.   June 1, 1914.)

### No. 10.

1. INSURANCE (§ 273*)—MARINE INSURANCE—IMPLIED WARRANTY OF SEA-WORTHINESS.

In every insurance upon a vessel there is an implied warranty on the part of the assured that at the time of sailing the vessel shall be seaworthy for the voyage insured, which extends not only to the hull, but if a sailing vessel to the sails and rigging.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 583–588; Dec. Dig. § 273.*]

2. INSURANCE (§ 481*)—MARINE INSURANCE—FREIGHT—ABILITY OF VESSEL TO COMPLETE VOYAGE.

To warrant a recovery on a policy insuring freight, it must appear that because of perils insured against the vessel could not with reasonable repairs and within a reasonable time complete the voyage and earn the freight.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1259–1261; Dec. Dig. § 481.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. INSURANCE (§ 481*)—MARINE INSURANCE—FREIGHT—DEFENSES AGAINST LIABILITY.

A schooner having insurance on her freight left Philadelphia in winter for a voyage to Charleston and other points and return. She encountered storms, and 46 days later put in at Bermuda in a serious condition. The evidence showed that when she sailed her hull was leaky, her sails in poor condition, and a gasoline engine used for the pumps was inoperative for want of simple repairs, and she was altogether unseaworthy for the voyage at that season. Such facts were reported by the captain, who, however, expressed the opinion that by making some repairs and mending the sails he could reach Charleston. He was ordered by the owners to obtain a survey and if possible have the vessel condemned and sold, which was finally done on the captain's statement that the owners refused to pay for any repairs. The report of survey showed that the damaged condition of the vessel was due largely to wear and tear, rot, and other defects, and not to sea perils during the voyage. *Held*, that the insurer was not liable for her failure to earn freight.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1259–1261; Dec. Dig. § 481.*]

In Admiralty. Suit by David S. Stetson against the Insurance Company of North America. Decree for respondent.

Edward F. Pugh, of Philadelphia, Pa., for libelant.
Henry R. Edmunds, of Philadelphia, Pa., for respondent.

THOMPSON, District Judge. The libelant sues to recover the sum of $1,700 as insurance upon freight on board or not on board the schooner John R. Penrose on a voyage from Philadelphia to Charleston, S. C., and Belfast, Ga., and return to Philadelphia for account of whom it may concern, loss if any payable to D. S. Stetson & Co., the libelant.

The Penrose sailed from Philadelphia for Charleston January 21, 1909, having loaded a cargo of 694 tons of gas coal, the freight upon which amounted to $763.40. She was under charter for her expected return voyage from Belfast, Ga., to Philadelphia to carry lumber under which the freight would have amounted to $2,100 or $2,200. The vessel never reached Charleston, but encountered violent storms, and at the end of 46 days put into Bermuda on March 7, 1909. The Penrose was leaking badly, and during the time she was battling with the storms her hand pumps were being constantly used; her gasoline engine and mechanical pump having become useless shortly after the stress of weather began. The first day the gale was encountered, the mainsail split and the forestaysail gave way, and subsequently other sails were rent and torn. The captain telegraphed to the libelant notifying him of his arrival at Bermuda and wrote him of the serious condition of the vessel. In his letter he said:

"She commenced to leak from the time we come to sea. * * * The engin stoped work from the first of the gale and has never worked any since. * * * The vessel nor her canvass was not fit for no such weather as we got for five week. * * * We will mend our sails and try to git along with them to Charleston. Mainsail foresail jib and staysail all verry poor sails, and we about used them all up but if we can have any decent weather can git to Charleston with them."

Upon receipt of this letter, the libelant, who was one of the owners, sent the captain an answer in which he stated:

"The writer to-day has been in consultation with the owners. Thomas Winsmore and Taulane are both uninsured, and instruct us not to advance one dollar on their account, for they will not pay, and their decision is for you to call a survey that will recommend the vessel to be condemned and sold. If you cannot get a survey to condemn the vessel and order her sold, then all you can do is to repair the engine, pumps and sails and proceed under sail for Charleston as you suggest. As before stated there is no insurance on the vessel, but the little we have on our interest, and notwithstanding that fact, Thos. Winsmore and Taulane say that vessel should be condemned and sold, for they will not pay or reimburse us for any amount we may advance towards the repairs of vessel at Bermuda or for towing her to Charleston, for she could not be towed over there for less then six or eight hundred dollars. If she is condemned and sold we can collect the $1,700 freight insurance we have for the trip, and then pay the bills, and Taulane can collect his insurance on the bills. We rely on you to do your best for the interest of all concerned and get the owners out of this trouble the best you can."

Upon the request of the captain, a survey was made at Bermuda, under a warrant from the United States consul, by two surveyors, who reported about two feet of water in the hold and that the vessel was in a serious condition. They estimated the probable cost of repairs at £570, and, as a result of a second survey, after 200 tons of the cargo had been discharged, concluded:

"Master reported to us that being without funds and the owners having refused to give any money to pay the expenses of the vessel, he could not discharge any more cargo, neither could he effect any repairs to the vessel."

They estimated her value as she lay at £80 and condemned her as unseaworthy and recommended her to be sold at public auction. The vessel, her sails and rigging, and the cargo, were sold by the captain at public auction. The total received from the sale of the vessel, her sails and rigging, was £206, and from the cargo £295, which, after deducting the expenses, left a balance paid to the libelant of £115.

[1] The respondent defends upon the ground that the contract of insurance is void by reason of the unseaworthiness of the vessel at the commencement of the voyage and also upon the ground that the breaking up of the voyage at Bermuda was not necessary, as the captain could have proceeded to Charleston with his cargo.

"There is no principle of marine insurance better settled than the one which declares that in every insurance upon a vessel there is an implied warranty upon the part of the assured that at the time of sailing the vessel shall be seaworthy for the voyage insured. This implied warranty is not confined to the sufficiency of the hull, but in a sailing vessel extends to the soundness of sails and rigging. * * * There is another principle applicable to the case under consideration, and it is this: If a ship, in a short time after leaving port, becomes leaky, * * * the presumption is that she was not 'seaworthy' when she sailed, and the onus probandi in such a case is thrown upon the assured to show that the inability arose from causes subsequent to the commencement of the voyage and attaching of the risk. * * * 'A ship is always presumed to have been defective when she sailed, unless her disability be proved to have been occasioned by the perils of the voyage.'" Myers v. The Girard Insurance Co., 26 Pa. 192.

If it sufficiently appears by the evidence that the vessel sailed in a leaky state and in want of repairs and that she was not equipped and

fitted out as she ought to have been, there is a violation on the part of the insured of the implied warranty that the vessel is seaworthy. Prescott v. Insurance Co., 1 Whart. (Pa.) 399, 30 Am. Dec. 207.

[2] "The contract of insurance upon freight is that the goods shall arrive at the port of delivery notwithstanding the perils insured against; and that, if they fail thus to arrive, and the owner is thereby unable to earn his freight, the underwriter will make it good. It does not undertake that the goods shall be delivered in a sound or merchantable state, or that the vessel in which they are shipped shall be safe against the dangers of the sea, but that it shall be in the power of the insured to earn his freight; that is, that the perils insured against shall not prevent the ship from earning full freight for the assured in that voyage. If the ship and cargo remain, notwithstanding the disasters, in a condition to continue the voyage, it is in his power to earn freight, and he is bound to proceed; but if damage happens to either, and the voyage is broken up, so that no freight can be earned, the owner is entitled to recover, as for a total or partial loss, according as he may or may not have earned freight pro rata itineris. If the damage happens to the vessel, and that can be repaired at the port of distress in a reasonable time, and at a reasonable expense, it is the duty of the owner to make the repairs, and to continue the voyage and earn his freight. * * * In every case, before he can recover of the underwriter, he must show that he was prevented by one of the perils insured against from completing the voyage, and, for that reason, had failed to entitle himself to freight from the shippers." Hugg v. Augusta Insurance and Banking Co., 48 U. S. 604, 12 L. Ed. 834.

[3] It is satisfactorily established by the evidence that the Penrose was not, when she sailed, in a seaworthy condition for a voyage in January around the Capes to Charleston. More credence is to be given to the statement in the captain's letter to the libelant before he was informed that the libelant desired the vessel condemned and sold than to his testimony after that information and the instructions from the libelant "to do your best for the interest of all concerned and get the owners out of this trouble the best you can." He states that "she commenced to leak from the time we come to sea" and that "the vessel nor her canvass was not fit for no such weather." The fact that the leaking of the vessel was due to her bad condition, and not to the storms which she experienced, appears from the report of the surveyors who examined her at Bermuda and from the testimony of Ernest Evald, who examined her after she was brought to the Raritan Dry Dock in New York in June. That the canvas was not fit for the voyage appears not only from the statement of the captain that it was not fit for such weather, but by his further statement in the letter to the libelant that the mainsail, foresail, jib, and staysails were all very poor sails. That very poor sails would split and tear in such gales was but natural. The gasoline engine, which should have been efficient to work the pump, stopped work in the first gale encountered in the voyage. It appears by the testimony of Evald and Dodge that all the gasoline engine required to put it in working condition was packing. That the condition of the vessel, her sails and engine, was bad when she arrived at Bermuda is undoubtedly true; but that this condition was sustained from sea perils is negatived by that portion of the report of the surveyors upon the third survey made at the request of the National Board of Marine Underwriters at Bermuda by Nathaniel Vesey, who was one of the original surveyors appointed

at the request of the captain, and W. B. Smith, which classified the damaged conditions as follows:

"First. The damage sustained from sea perils: Axle of steering wheel bent. Boat davit bent down. Several chain bolts slack.

"Second. The damage from wear and tear, rot, or other natural defects: Rail of both quarters open at angle. Scarf of mail rail starboard side adrift. Buts of decks, waterway seam port side, buts of topsides slack, many buts of topsides very open and seams slack in places. Plank in poor condition. Seams on quarter of quick work open."

The report upon the third survey is not contradictory to that upon the first and second surveys. At the two earlier surveys, it was not reported that the conditions, which in the third survey were found to be the result of damage from wear and tear, rot, and other natural defects, were the result of sea perils. In fact, the two original surveys did not contain any finding as to the cause of the damaged condition of the vessel, and upon the third survey the estimated cost of repairs necessary to be effected to make good damages sustained from sea perils, so as to render the schooner seaworthy, is estimated at £35. The fact that the condition of the vessel causing leakage was not the result of the strain of the voyage is shown also by the testimony of Mr. Evald when he examined the vessel at the dock in New York. While the testimony of Capt. Dodge, who took the vessel from Bermuda to New York, shows that she was in very bad condition, there is nothing in his evidence to show that that condition arose from the sea perils which had been sustained while the vessel was being driven about at sea before arriving at Bermuda.

The evidence, in my opinion, amply sustains the contention of the respondent that the vessel was unseaworthy from the bad condition of her hull, in that her planking was so bad that it would not retain the caulking, and that not only was the hull unseaworthy, but the poor condition of the sails and the gasoline engine rendered them also unseaworthy. The failure of the owners of the Penrose to make the hull tight, strong, and seaworthy, to equip her with proper sails, and· sending her to sea with the gasoline engine defective as to packing constituted a breach upon their part of the implied warranty of seaworthiness which forfeits the right of the insured to recover under the policy. While, under these circumstances, a discussion of the necessity for the condemnation of the vessel at Bermuda may be unnecessary, the evidence sustains the respondent's contention in that regard. It is apparent from the letter of the captain to the libelant upon arrival at Bermuda that he did not then consider it impracticable to continue the voyage to Charleston. He said:

"We will mend our sails and try to git along with them to Charleston. Mainsail foresail jib and staysail all verry poor sails and we about used them all up but if we can have any decent weather can git to Charleston with them."

After the receipt of the letter from the libelant stating, "If you cannot get a survey to condemn the vessel and order her sold, then all you can do is to repair the engine, pumps and sails and proceed under sail for Charleston as you suggest. You of course will have to give a

draft at 3 days sight for the bills and expenses at Bermuda," and further informing him that the co-owners would not pay or reimburse the libelant for any amount advanced, the attitude of the captain appears to have changed. While he was able to keep the vessel afloat for over 40 days in violent storms, after receipt of the letter he allowed her to fill while lying in the harbor, and part of her cargo had to be discharged to enable the surveyors to examine her hull. The condemnation was based upon the fact that the master reported to the surveyors that he was without funds, and that the owners refused to give any money to pay any expenses, and that he could not discharge any more cargo, neither could he effect any repairs to the vessel. A condemnation and sale brought about under the circumstances developed in this case would not warrant a finding that the voyage was broken up by reason of perils against which the respondent insured. The sale and condemnation are not entitled to any weight as evidence to hold the insurer under the policy.

A decree will be entered dismissing the libel at the cost of the libelant.